1999 SD 60

CHEYENNE RIVER SIOUX TRIBE
TELEPHONE AUTHORITY and US
West Communications, Inc., Appel-
lants,

v.

PUBLIC UTILITIES COMMISSION
OF SOUTH DAKOTA, Appellee,

and

Corson County Commission, and
McIntosh City Council,
Intervenors,

and

Doug Scott, Intervenor and Appellee.

Nos. 20062, 20464.

Supreme Court of South Dakota.

Argued Jan. 13, 1999.

Decided May 19, 1999.

Thomas J. Welk and Tamara A. Wilka of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, South Dakota, Attorneys for appellant US WEST.

Rochelle Ducheneaux, Gettysburg, South Dakota and Scott B. McElroy and Alice E. Walker of Greene, Meyer & McElroy, Boulder, Colorado, Attorneys for appellant Cheyenne River Sioux Tribe Telephone Authority.

Mark Barnett, Attorney General, Lawrence E. Long, Chief Deputy Attorney General, Pierre, South Dakota, Camron D. Hoseck, Special Assistant Attorney General, Public Utilities Commission, Pierre, South Dakota, Attorneys for appellee Public Utilities Commission of South Dakota.

Steven Aberle, Timber Lake, South Dakota, Attorney for appellee Doug Scott.

MILLER, Chief Justice.

[¶ 1.] The Public Utilities Commission (PUC) denied the proposed sale of three telephone exchanges from US WEST to the Cheyenne River Sioux Tribe Telephone Authority (CRSTTA). The circuit court affirmed PUC's decision. We likewise affirm.

### FACTS

[¶ 2.] The Cheyenne River Sioux Tribe is a federally recognized Indian Tribe. CRSTTA, a wholly owned subsidiary of the Tribe, has provided phone service, among other things, principally on the Cheyenne River Sioux Reservation since 1958.

[¶ 3.] In early 1994, US WEST, a Colorado corporation which has provided telephone services for a number of years in South Dakota, offered sixty-seven local telephone exchanges for sale. A consortium of potential buyers, which included CRSTTA, was formed to bid on the exchanges. CRSTTA intended to purchase (through its subsidiary Owl River Telephone, Inc.) the Morristown, Timber Lake and Nisland exchanges.[1]

[¶ 4.] CRSTTA successfully bid on those exchanges [2] and, on December 7, 1994, en-

---

1. CRSTTA later decided against purchasing the Nisland exchange and instead elected to purchase the McIntosh exchange. The application received by PUC was amended to reflect the change.

2. The McIntosh exchange serves the town of McIntosh and the surrounding community and is located within the boundaries of the Standing Rock Sioux Indian Reservation. The Timber Lake exchange serves the town of

tered into a purchase agreement with US WEST. US WEST and the consortium filed a joint application with PUC for approval of the sale of the sixty-seven exchanges.

[¶ 5.] At the time of the proposed sales, no legislation explicitly required PUC approval of such sales. However, the 1995 Legislature passed Senate Bill 240, now codified at SDCL 49–31–59, which specifically required PUC approval of all sales of telephone exchanges. The legislation contained an emergency clause, and it became effective on March 30, 1995.

[¶ 6.] PUC applied the new law when considering the proposed sales of the telephone exchanges. Public hearings were held and, on July 31, 1995, PUC denied the sale of four of the sixty-seven exchanges: namely the three exchanges CRSTTA intended to purchase and the Alcester exchange.[3]

[¶ 7.] US WEST and CRSTTA appealed PUC's decision. The court found that PUC had jurisdiction over the exchange sales, but reversed and remanded the decision finding that: (1) PUC improperly conditioned its approval upon CRSTTA's refusal to waive its sovereign immunity; (2) the decision was based upon PUC's erroneous conclusion that SDCL 49–1–17 prohibited approval of the proposed sales; and (3) PUC did not enter findings of fact on each of the statutory factors listed in SDCL 49–31–59.

[¶ 8.] On remand, PUC's staff moved for PUC to consider the matter on the record. CRSTTA and US WEST requested a reopening of the record to consider new evidence, such as the enactment of the Telecommunications Act of 1996, the election of a new PUC Commissioner, the certificate of convenience and necessity to

operate issued by the Standing Rock Sioux Tribe, and CRSTTA's newly adopted dispute resolution mechanisms.

[¶ 9.] On May 7, 1997, PUC denied the motion to reopen the record. It also denied the motion to take judicial notice of CRSTTA's dispute resolution procedures and of Standing Rock Sioux Tribe's issuance of a provisional certificate of convenience and necessity.

[¶ 10.] On August 22, 1997, PUC again denied the sale of the exchanges. US WEST and CRSTTA appealed the decision to the circuit court, which affirmed PUC's findings of fact and conclusions of law.

[¶ 11.] On appeal to this Court, CRSTTA and US WEST present the following issues:

1. Whether PUC had jurisdiction over the sale of the portion of the Timber Lake exchange located on the Cheyenne River Sioux Indian Reservation.

2. Whether PUC's decisions denying CRSTTA's application to purchase the off-reservation portion of the Timber Lake exchange, the Morristown exchange, and the McIntosh exchange should be reversed pursuant to SDCL 1–26–36.

3. Whether PUC's refusal to approve the joint application regarding the telephone exchange sales based on its interpretation of SDCL 49–31–59 constitutes a denial of equal protection under the law in violation of the Fourteenth Amendment to the United States Constitution and Article VI, § 18, of the South Dakota Constitution.

Timber Lake. Approximately one-half of the exchange territory is located within the boundaries of the Cheyenne River Sioux Indian Reservation and the remainder is located within the boundaries of the Standing Rock Sioux Indian Reservation. The Morristown exchange serves the town of Morristown and the surrounding community. It is located

within the boundaries of the Standing Rock Sioux Indian Reservation.

3. The Beresford Municipal Telephone Company intended to purchase the Alcester exchange, but state law prohibits such sale. *See* SDCL 9–41–1.

4. Whether PUC and the circuit court abused their discretion by failing to take judicial notice of a dispute resolution mechanism adopted by CRSTTA and a provisional certificate of convenience and necessity issued by the Standing Rock Sioux Tribe.

## STANDARD OF REVIEW

[¶ 12.] SDCL 1–26–36 governs review of agency decisions.[4] This Court makes the same review of the administrative agency's decision as did the circuit court, unaided by any presumption that the circuit court's decision was correct. *Appeal of Templeton*, 403 N.W.2d 398 (S.D.1987). When the issue is a question of fact, the actions of the agency are judged by the clearly erroneous standard. *Application of Northwestern Bell Tel. Co.*, 382 N.W.2d 413 (S.D.1986). When the issue is a question of law, the actions of the agency are fully reviewable. *Matter of State & City Sales Tax Liability*, 437 N.W.2d 209 (S.D.1989). Mixed questions of law and fact are also fully reviewable. *Permann v. Department of Labor, Unemp. Ins. Div.*, 411 N.W.2d 113 (S.D.1987).

*Zoss v. United Bldg. Ctrs., Inc.*, 1997 SD 93, ¶ 6, 566 N.W.2d 840, 843 (quoting *Tieszen v. John Morrell & Co.*, 528 N.W.2d 401, 403–04 (S.D.1995) (citation omitted)).

4. SDCL 1–26–36 provides, in pertinent part:
The court shall give great weight to the findings made and inferences drawn by an agency on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;

## DECISION

[¶ 13.] **1. PUC had jurisdiction over the sale of the portion of the Timber Lake exchange located on the Cheyenne River Sioux Indian Reservation.**

[¶ 14.] US WEST and CRSTTA argue that PUC's assertion of jurisdiction over the sale of the on-reservation portion of the Timber Lake exchange[5] infringed on the Tribe's right of tribal self-government, was barred by federal preemption, and violated well-established principles of federal Indian law. We disagree.

[¶ 15.] *a. Infringement*

[¶ 16.] CRSTTA and US WEST claim PUC lacked the authority to regulate CRSTTA's business activities within the boundaries of the Cheyenne River Sioux Indian Reservation. They claim that, by regulating such activities, PUC infringed on CRSTTA's exercise of tribal self-government.

[¶ 17.] Tribal governments "derive their powers of government from their inherent sovereignty and not by delegation from the federal government." *Mexican v. Circle Bear*, 370 N.W.2d 737, 740 (S.D. 1985) (citing *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)). "Indian tribes exist as sovereign entities with powers of self-government." *Id.* at 740–41 (citations omitted). However, "[t]he principle of tribal self-govern-

(5) Clearly erroneous in light of the entire evidence in the record; or
(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
A court shall enter its own findings of fact and conclusions of law or may affirm the findings and conclusions entered by the agency as part of its judgment.

5. Approximately one-half of the Timber Lake exchange is located within the boundaries of the Cheyenne River Sioux Indian Reservation. The remaining half of the exchange is located within the boundaries of the Standing Rock Sioux Indian Reservation.

ment, grounded in notions of inherent sovereignty and in congressional policies, seeks an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other." *Washington v. Confederated Tribes,* 447 U.S. 134, 156, 100 S.Ct. 2069, 2083, 65 L.Ed.2d 10, 31 (1980) (citation omitted).

[¶ 18.] CRSTTA and US WEST argue that, because the Tribe approved the transaction regarding the on-reservation portion of the Timber Lake exchange, PUC's exercise of authority over the transaction infringes on the Tribe's right to self-governance. They rely on *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), to support their position. We find their reliance to be misplaced.

[¶ 19.] In *Montana,* the Supreme Court stated that "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Id.* at 564, 101 S.Ct. at 1258, 67 L.Ed.2d at 509–10 (citing *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114, 119 (1973); *Williams v. Lee,* 358 U.S. 217, 219–20, 79 S.Ct. 269, 270, 3 L.Ed.2d 251, 253 (1959); *United States v. Kagama,* 118 U.S. 375, 381–82, 6 S.Ct. 1109, 1112–13, 30 L.Ed. 228, 230 (1886)). Furthermore, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.* at 565, 101 S.Ct. at 1258, 67 L.Ed.2d at 510. However, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* (citing *Williams,* 358 U.S. at 223, 79 S.Ct. at 272, 3 L.Ed.2d at 255–56; *Morris v. Hitchcock,* 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030 (1904) (citations omitted)). In addition,

"[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566, 101 S.Ct. at 1258, 67 L.Ed.2d at 511.

[¶ 20.] CRSTTA and US WEST claim the *Montana* consent exception is applicable here because the Tribe entered into a consensual, contractual agreement with US WEST. They argue that, because of this agreement, the Tribe has jurisdiction over US WEST's on-reservation activities. We disagree.

[¶ 21.] The regulatory scheme of telecommunications services specifically grants PUC authority and jurisdiction over intrastate facilities. *See* 47 USC § 152(b). The authority of PUC is extensive and crucial to the overall regulatory scheme. *See* SDCL ch. 49–31. Among other things, it has "general supervision and control of all telecommunications companies offering common carrier services within the state to the extent such business is not otherwise regulated by federal law or regulation." SDCL 49–31–3. In addition, PUC has the authority to determine and approve rates. SDCL 49–31–4. Moreover, SDCL 49–31–59 requires PUC approval of *all sales of telephone exchanges.*

[¶ 22.] Clearly, this extensive congressional and legislative authority authorizes PUC to regulate the activities of US WEST and its sale of telephone exchanges, whether on or off the reservation. Accordingly, PUC's regulation of US WEST is not an improper infringement upon the Cheyenne River Sioux Tribe's right to self-government.

[¶ 23.] Moreover, CRSTTA's claim of infringement is premature. As stated in *Montana,* the Tribe may regulate nonmembers who enter into consensual, contractual relations with it. 450 U.S. at 565, 101 S.Ct. at 1258, 67 L.Ed.2d at 510. However, the Tribe cannot extend its exer-

cise of self-government beyond the boundaries of the reservation and to the sale by US WEST of the Timber Lake exchange. It is within PUC's authority, not the Tribe's, to regulate and approve the sale. The contract for purchase of the exchange was dependent upon approval of the sale, not upon the consensual agreement between US WEST and CRSTTA. Therefore, we cannot hold that PUC's jurisdiction infringes upon the Tribe's right to "make their own laws and be ruled by them." *See Washington,* 447 U.S. at 156, 100 S.Ct. at 2083, 65 L.Ed.2d at 31 (quoting *Williams,* 358 U.S. at 220, 79 S.Ct. at 271, 3 L.Ed.2d at 254).

[¶ 24.] *b. Federal preemption*

█ [¶ 25.] CRSTTA and US WEST claim that federal preemption bars PUC from asserting its authority to approve the sale of the portion of the Timber Lake exchange located on the Cheyenne River Sioux Indian Reservation. Again, we disagree.

█ [¶ 26.] Generally, "[s]tate jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 334, 103 S.Ct. 2378, 2386, 76 L.Ed.2d 611, 620 (1983) (citing *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 144, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665, 673 (1980)). For federal law to preempt state law, no "express Congressional statement" of preemption is required. *Id.* at 334, 103 S.Ct. at 2386, 76 L.Ed.2d at 620. However, preemption analysis "requires a particularized examination of the relevant state, federal, and tribal interests." *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 176, 109

S.Ct. 1698, 1707, 104 L.Ed.2d 209, 226–27 (1989) (citing *Ramah Navajo School Bd., Inc. v. Bureau of Revenue,* 458 U.S. 832, 838, 102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174, 1180 (1982)).

[¶ 27.] Here, CRSTTA and US WEST argue that PUC's assertion of authority is preempted by the federal interest of "promoting economic development and self-sufficiency for Indian tribes." *See Bracker,* 448 U.S. at 143, 100 S.Ct. at 2583–84, 65 L.Ed.2d at 672. They point, in general, to presidential pronouncements and congressional initiatives to support their argument.[6] Because they do not identify any specific federal statute that preempts PUC's authority or that encourages tribal regulation of telephone exchanges, their argument fails.

[¶ 28.] US WEST is regulated by both the Federal Communications Commission (FCC) and PUC as part of a scheme to provide "a rapid, efficient, nationwide, and world-wide wire and radio communication service with adequate facilities at reasonable charges[.]" 47 USC § 151. Even though the FCC has regulatory power, the regulatory scheme also provides for state regulation of intrastate communications. 47 USC § 152(b). As this Court has stated, "the FCC is deprived of regulatory power over telephone service[s] which, in their nature, are separable from and do not substantially affect the conduct or development of interstate communications." *American Phone Inc. v. Northwestern Bell Tel. Co.,* 437 N.W.2d 175, 177 (S.D.1989) (citing *North Carolina Util. Comm'n v. FCC,* 537 F.2d 787 (4th Cir.1976)). With this dual regulatory role, " '[when] determining whether a state may exercise jurisdiction, the question to be addressed is whether assumption of jurisdiction would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* (quoting

6. Although CRSTTA and US WEST cite a laundry list of congressional initiatives intended to advance economic development on Indian reservations, they fail to identify which of these preempts PUC's jurisdiction over the sale of the on-reservation portion of the Timber Lake exchange.

*Louisiana Public Serv. Comm'n v. FCC,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)).

[¶ 29.] The primary purposes and objectives of Congress in regulating telecommunications are to protect telecommunications' consumers. Consumers are ensured, through this regulation, of adequate facilities and reasonable rates. This protection applies to all consumers, whether they reside on or off an Indian reservation. Such regulation is an important government function, and PUC's regulatory authority furthers its objectives and purposes; it does not interfere with them.

[¶ 30.] Therefore, we find that PUC's authority to regulate in this area is not preempted by federal law, but rather, is a significant, as well as authorized, part of the overall regulatory scheme. *See Rice v. Rehner,* 463 U.S. 713, 726, 103 S.Ct. 3291, 3299, 77 L.Ed.2d 961, 974 (1983). PUC has the authority to regulate US WEST's activities in South Dakota, including its proposed sale of telephone exchanges.

[¶ 31.] *c. Violation of well-established principles of federal Indian law*

[¶ 32.] CRSTTA and US WEST argue that the holding in *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,* 476 U.S. 877, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986) (*Wold 2* ), prevents PUC from obtaining jurisdiction over the on-reservation portion of the Timber Lake exchange by "implicitly conditioning its approval for the sale on a relinquishment by the Tribe of its tribal sovereignty and political integrity." We do not agree.

[¶ 33.] The underlying litigation in *Wold 2* involved a suit brought in the state court of North Dakota by the Three Affiliated Tribes of Fort Berthold Reservation (Tribes) against Wold Engineering, alleging negligence and breach of contract.

The North Dakota Supreme Court found that the Tribes, "could not avail [themselves] of state court jurisdiction" unless they waived their sovereign immunity and consented "to have any civil disputes in state court to which it is a party adjudicated under state law." *Id.* at 878, 106 S.Ct. at 2306–07, 90 L.Ed.2d at 886 (citation omitted). In *Wold 2,* the United States Supreme Court reversed the North Dakota court, holding that the North Dakota law was preempted "as it applied to disclaim pre-existing jurisdiction over suits by tribal plaintiffs against non-Indians for which there is no other forum, absent the Tribe's waiver of its sovereign immunity and consent to the application of state civil law in all cases to which it is a party[.]" *Id.* at 883, 106 S.Ct. at 2309, 90 L.Ed.2d at 889. The Supreme Court found that the state's interest was "unduly burdensome on the federal and tribal interests." *Id.* at 888, 106 S.Ct. at 2311–12, 90 L.Ed.2d at 892.

[¶ 34.] CRSTTA and US WEST claim that PUC's disapproval of the sale of the Timber Lake exchange was implicitly based upon the Tribe's failure to waive its sovereign immunity. They thus assert that PUC's action was "unduly burdensome," "overly intrusive," and reached the level of a *Wold 2* violation. We find this argument to be without merit.

[¶ 35.] The trial court specifically directed PUC on remand to reconsider the sales without conditioning approval on the Tribe's refusal of a sovereign immunity waiver. The record reflects that PUC followed the court's directive.[7] In PUC's amended order and decision, it entered findings of fact on each of the specific factors listed in SDCL 49–31–59. The record shows that it denied approval of the sale of the exchange based upon its findings and not upon the Tribe's refusal to

---

7. CRSTTA and US WEST concede that PUC's amended order regarding the sale of the Timber Lake exchange did not explicitly condition its disapproval of the sale on the Tribe's failure to waive its sovereign immunity.

waive its sovereign immunity. Therefore, we find no error.

**[¶ 36.]   2.   PUC properly applied the factors listed in SDCL 49–31–59 when considering the sale of the off-reservation portion of the Timber Lake exchange, and the Morristown and McIntosh exchanges.**

[¶ 37.] SDCL 49–31–59 provides that when voting on the sale of an exchange, the commission

shall, if applicable, consider the protection of the public interest, the adequacy of local telephone service, the reasonableness of rates for local service, the provision of 911, Enhanced 911, and other public safety services, the payment of taxes, and the ability of the local exchange company to provide modern, state-of-the-art telecommunications services that will help promote economic development, tele-medicine, and distance learning in rural South Dakota.

[¶ 38.] CRSTTA and US WEST claim that PUC's decisions should be reversed, because the sales of the Morristown, McIntosh, and the off-reservation portion of the Timber Lake exchange met the statutory requirements, as provided in SDCL 49–31–59. Again, we disagree.

[¶ 39.] The record establishes that PUC considered, and entered findings of fact on, each of the statutory factors in making its determination whether to approve the proposed sale of the exchanges. PUC clearly stated how the proposed sales met or failed to meet the statutory factors. It then determined that the sales would not be in the public's best interest for the following reasons:

1. Since CRSTTA maintains there is no enforcement mechanism that would require CRSTTA to pay gross receipts taxes, approval of the sale would result in the loss of significant tax revenue for the cities, counties, and school districts located within the . . . exchange[s];

2. The lack of regulatory control by [PUC] would mean that [PUC] would be unable to set conditions of sale that must be followed by CRSTTA;

3. [PUC] is unable to require as a condition of sale that CRSTTA offer all existing services that are currently offered by US WEST;

4. [PUC] is unable to require as a condition of the sale that CRSTTA honor all existing US WEST contracts and agreements;

5. The lack of regulatory control and the lack of the ability of the majority of subscribers to vote or have a political voice in CRSTTA could negatively affect adequacy of service;

6. [PUC] is unable to require as a condition of sale that CRSTTA not increase the current local rates for 18 months;

7. [PUC] is unable to require as a condition of the sale that CRSTTA not change any current extended area service arrangements without prior approval by [PUC]; and

8. [PUC] is unable to require CRSTTA to make any improvements necessary for the public's safety, convenience, and accommodation as allowed by SDCL 49–31–7.

Based on these findings, it denied approval of the sales.

[¶ 40.] Our review of the record shows that PUC followed the circuit court's directives and properly applied the statutory factors when considering the sales. Accordingly, we find no error.

**[¶ 41.]   3.   PUC's refusal to approve the joint application regarding the telephone exchange sales based on its interpretation of SDCL 49–31–59 did not constitute a denial of equal protection under the law in violation of the Fourteenth Amendment to the United States Constitution and Article VI, § 18, of the South Dakota Constitution.**

[¶ 42.] SDCL 49–31–59 provides:

The Legislature recognizes that the sale of telephone exchanges has a profound impact upon South Dakota, especially during a time when the world is undergoing a revolution in telecommunications technology. Because the sale of any exchange in our state directly affects the continued vitality and viability of rural South Dakota during that revolution, it is the Legislature's intent that the sale of each exchange be held to a high degree of scrutiny. Any sale of a telecommunications exchange shall be approved by a vote of the Public Utilities Commission. A separate vote is required on the sale of each exchange. In voting, the commission shall, if applicable, consider the protection of the public interest, the adequacy of local telephone service, the reasonableness of rates for local service, the provision of 911, Enhanced 911, and other public safety services, the payment of taxes, and the ability of the local exchange company to provide modern, state-of-the-art telecommunications services that will help promote economic development, tele-medicine, and distance learning in rural South Dakota. The commission shall issue its order pursuant to this section within one hundred eighty days of the filing of the application.

[¶ 43.] CRSTTA and US WEST claim PUC's refusal to approve the sales, based on its interpretation of SDCL 49–31–59, constitutes a denial of equal protection under the law. They argue that PUC's reliance on the potential effect of CRSTTA's sovereign immunity caused it to treat CRSTTA disparately from the other successful bidders when denying approval of the sales. They claim that PUC's actions violated the Fourteenth Amendment to the United States Constitution and Article VI, § 18, of the South Dakota Constitution.[8] We disagree.

[¶ 44.] Generally, "[a]ny legislative act is accorded a presumption in favor of constitutionality and that presumption is not overcome until the act is clearly and unmistakably shown beyond a reasonable doubt to violate fundamental constitutional principles." *Americana Healthcare Ctr. v. Randall*, 513 N.W.2d 566, 572 (S.D.1994) (citation omitted). In addition, with this presumption of validity, " 'legislation ... will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.' " *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985)).

[¶ 45.] Here, US WEST and CRSTTA assert that our review requires heightened scrutiny. They argue that strict scrutiny, and not rational basis scrutiny, must be applied in our analysis.[9] Their argument lacks merit. "Strict scrutiny applies only to fundamental rights or suspect classes." *Lyons v. Lederle Lab.*, 440 N.W.2d 769, 771 (S.D.1989). Neither a fundamental right nor a suspect class is present here. Rational basis scrutiny is the most appropriate analysis.[10]

---

8. The Fourteenth Amendment to the United States Constitution states, "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S.Const. Amend. XIV, § 1. Article VI, § 18, of the South Dakota Constitution provides that "[n]o law shall be passed granting to any citizen, class of citizens or corporation, privileges or immunities upon which the same terms shall not equally belong to all citizens or corporations."

9. Interestingly, it should be noted that in the trial court's memorandum decision, dated February 21, 1997, the court stated that counsel for CRSTTA conceded at oral argument that rational basis scrutiny applies.

10. It is important to note that this Court, when addressing claims involving alleged violations of due process, has stated that the rational basis test as applied under our constitution is more stringent, in that it requires a "real and substantial relation to the objects sought to be attained." *See Katz v. Bd. of Med. and Osteopathic Exam'r*, 432 N.W.2d

[¶ 46.] This Court has adopted a two-pronged test "regarding equal protection when legitimacy, suspect classes and fundamental rights are not involved:

(1) [W]hether the statute does set up arbitrary classifications among various persons subject to it.

(2) [W]hether there is a rational relationship between the classification and some legitimate legislative purpose."

*Lyons,* 440 N.W.2d at 771 (citing *City of Aberdeen v. Meidinger,* 89 S.D. 412, 415, 233 N.W.2d 331, 333 (1975)).

[¶ 47.] In applying the first prong, this Court looks " 'to see if the statute applies equally to all people.' " *SD Physician's Health Group v. State,* 447 N.W.2d 511, 515 (S.D.1989) (quoting *Lyons,* 440 N.W.2d at 771). US WEST and CRSTTA argue that PUC's application of SDCL 49–31–59 to CRSTTA arbitrarily classifies it as ineligible to purchase because of "the effect of its sovereign immunity." We do not agree.

[¶ 48.] Clearly, SDCL 49–31–59 treats each potential purchaser of a telephone exchange uniformly, and does not create arbitrary classifications. The statute requires that each sale be approved by PUC and that a separate vote be taken on every sale. In addition, PUC must consider the same factors when voting on each individual sale of an exchange. Therefore, the statute applies equally to all and does not arbitrarily classify those subject to it.[11]

[¶ 49.] "The second prong of the test requires a rational relationship between this classification and some legitimate state interest." *Americana,* 513 N.W.2d at 573. South Dakota clearly has a legitimate interest in protecting telecommunications' consumers and in providing quality,

as well as adequate, telecommunications services to its citizens. *See Northwestern Bell Tel. Co. v. Chicago & N.W. Trans. Co.,* 245 N.W.2d 639, 642 (S.D.1976) (citations omitted) (stating that "public service 'commissions are generally empowered to, and are created with the intention that they should, regulate public utilities insofar as the powers and operations of such utilities affect the public interest and welfare' "). The statute provides for the protection of such interests by requiring PUC approval of each sale of a telephone exchange. As the language of the statute explains, "the sale of any exchange in our state directly affects the continued vitality and viability of rural South Dakota ... it is the Legislature's intent that the sale of each exchange be held to a high degree of scrutiny." It is legitimately in the public interest to require such scrutiny.

[¶ 50.] Having concluded that SDCL 49–31–59 passes rational basis scrutiny, we hold that PUC's application of the statute to the exchange sales did not constitute a denial of equal protection under the law.

[¶ 51.] **4. PUC and the trial court did not abuse their discretion by failing to reopen the record on remand.**

[¶ 52.] US WEST and CRSTTA claim PUC and the circuit court abused their discretion by limiting the scope of remand to the record before them. They further claim that it was an abuse of discretion for PUC and the circuit court to refuse to take judicial notice of CRSTTA's newly adopted dispute resolution procedures and of the fact that the Standing Rock Sioux Tribe issued a provisional certificate of convenience and necessity to CRSTTA to operate the exchanges on the Standing Rock Indian Reservation.[12]

---

274, 278 n. 6 (S.D.1988) (citation omitted). We conclude that the statute here, though only needing to pass rational basis scrutiny, would also pass this heightened level of scrutiny.

11. Because no arbitrary classification exists, we need not reach the second prong of the

test. However, even considering the second prong, no denial of the equal protection of the laws can be established.

12. Arguably, such facts are not properly subject to judicial notice. *See* SDCL ch. 19–10; *see also Nase v. Christensen,* 409 N.W.2d 131, 132 (S.D.1987).

[¶ 53.] When remanding US WEST's and CRSTTA's initial appeal, the circuit court stated:

> The Commission's decision is ... reversed and remanded *on the record* because the Commission improperly conditioned its approval upon the CRSTTA's refusal to waive its sovereign immunity, because the decision was based upon the Commission's erroneous conclusion that SDCL 49–1–17 prohibited approval of the proposed sales, and because the Commission did not enter findings of fact on each of the statutory factors listed in SDCL 49–31–59. (Emphasis added).

[¶ 54.] As this Court has previously stated, "[t]he decision to remand lies within the judicial discretion of the trial court and our review is whether it abused its discretion." *In re Beaver Lake*, 466 N.W.2d 163, 167 (S.D.1991) (citing *State & City Sales Tax Liability*, 437 N.W.2d at 212). It is appropriate for a court to remand to an agency for further proceedings. SDCL 1–26–36. Moreover, a court may limit the scope of the remand. *See Public Util. Comm'n v. GTE–SW*, 833 S.W.2d 153, 175 (Tex.App.1992) (a reviewing court has the power to control the scope of remand); *see also Warren v. Department of Admin.*, 590 So.2d 514, 515 (Fla.App. 5 Dist.1991) (stating "[r]emand for a specific act does not reopen the entire case[.]").

[¶ 55.] Here, the court's order limited the scope of the remand to the record before it and to the issues that the court determined PUC needed to address. It was within the court's discretion to so order. *See GTE–SW*, 833 S.W.2d at 175. As such, we find no error.

[¶ 56.] Affirmed.

[¶ 57.] SABERS, AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.

