2001 SD 32

**The Filing by GCC LICENSE CORPORATION for Designation as an Eligible Telecommunications Carrier.**

Nos. 21510, 21521, 21525.

Supreme Court of South Dakota.

Argued on Nov. 28, 2000.

Decided March 14, 2001.

Rehearing Denied April 30, 2001.

Rolayne Ailts Wiest, Special Assistant Attorney General, Public Utilities Commission, Pierre, SD, Attorney for appellant PUC.

Richard D. Coit, Executive Director, SDITC, Pierre, SD, Attorney for appellant SD Independent Telephone Coalition.

Tamara A. Wilka and Thomas J. Welk of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, SD.

Alex Duarte, U.S. West Communications, Inc., Denver, CO, Attorneys for appellant U.S. West.

Paul S. Swedlund of Gunderson, Palmer, Goodsell & Nelson, Rapid City, SD, Attorneys for appellee GCC.

Mark J. Ayotte and Philip R. Schenkenberg of Briggs and Morgan, St. Paul, MN, Attorneys for appellee GCC.

KONENKAMP, Justice.

[¶ 1.] In this appeal, we examine whether the South Dakota Public Utilities Commission erroneously denied a wireless telecommunications company's application to become an eligible telecommunications carrier (ETC). To answer the question, we interpret 47 U.S.C. 214(e)(1), the federal statute governing the requirements for ETC status. The PUC read this statute to require that applicants must presently be providing or offering all enumerated services before ETC designation. On appeal, the circuit court reversed, ruling that federal law only requires applicants to show that they are capable of offering or providing the required services. The court remanded the case to the PUC solely for findings on whether ETC designation in South Dakota rural exchanges is in the public interest. We affirm the circuit court in all respects.

### A.

[¶ 2.] The Telecommunications Act of 1996 accomplished the most comprehensive restructuring of telecommunications law since the Communications Act of 1934. Indeed, Congress directed that the 1996 Act, including its provisions on local competition, be inserted into the 1934 Act. Telecommunications Act of 1996 § 1(b), Pub.Law 104—104, 110 Stat. 56. In the main, the Act creates a framework to encourage swift deployment of new technologies, to open telecommunications markets to competition, and to reduce regulation, so that Americans can enjoy lower prices and higher quality services. *Id.* To attain these goals, Congress sought to end the previously monopolistic local telephone markets in part by prohibiting states from imposing legal obstacles to impede competition. *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 726, 142 L.Ed.2d 835 (1999). "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications services." 47 U.S.C. 253. Congress was so set on removing barriers to entry that it autho-

rized the FCC to preempt any state infringement "to the extent necessary to correct such violation or inconsistency." 47 U.S.C. 253(d). To be legally viable, any state regulation must be administered on a "competitively neutral basis." 47 U.S.C. 253(b).

[¶ 3.] The 1996 Act empowers states to grant certain entities the status of "eligible telecommunications carrier." 47 U.S.C. 214(e).[1] One of the benefits of becoming an ETC is the requirement that other carriers make available "public switched network infrastructure, technology, information, and telecommunications facilities and functions" at reasonable prices. 47 U.S.C. 259(a); 47 U.S.C. 259(b). ETCs are eligible to receive federal universal service financial support, but must use such support "only for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C. 254(e). An ETC is obliged, at the risk of financial sanctions, to serve designated customers at appropri-

ate prices. 47 U.S.C. 214(d). State utility commissions are required to ensure that telephone service providers not exclude areas more costly to serve and those commissions must "determine which common carrier or carriers are best able to provide such service to the requesting unserved community or portion thereof...." 47 U.S.C. 214(e)(3).

**B.**

[¶ 4.] On August 25, 1998, GCC License Corporation, a mobile cellular service provider, and a "common carrier" under federal law, applied for ETC status in all South Dakota counties.[2] Intervening to oppose GCC's request were Dakota Telecommunications Group, Inc., South Dakota Independent Telephone Coalition,[3] and U.S. West Communications, Inc (now Qwest).[4] The hearing took place on December 17–18, 1998.

[¶ 5.] GCC is licensed to provide cellular service throughout South Dakota and has existing signal coverage in 98% of the

1. 47 U.S.C. § 214(e) states in relevant part:
Provision of universal service
(1) Eligible telecommunications carriers
A common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall be eligible to receive universal service support in accordance with section 254 of this title and shall, throughout the service area for which the designation is received—
(A) offer the services that are supported by Federal universal service support mechanisms under section 254(c) of this title, either using its own facilities or a combination of its own facilities and resale of another carrier's services (including the services offered by another eligible telecommunications carrier); and
(B) advertise the availability of such services and the charges therefor using media of general distribution.
(2) Designation of eligible telecommunications carriers
A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. Upon request and consistent with the public interest, convenience, and necessi-

ty, the State commission may, in the case of an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by the State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

2. GCC conducts its cellular business under the tradename Cellular One, a wholly owned subsidiary of Western Wireless Corporation.

3. SDITC is an incorporated organization that represents the interests of independent and municipal telephone companies operating in South Dakota. Each member of this organization is a rural telephone company and an incumbent local exchange carrier.

4. US West, now Qwest, is a non-rural telephone company and is the only non-rural carrier designated as an ETC in all non-rural exchanges where GCC seeks designation.

state. In its application, GCC asserted that it currently provides or is capable of providing all the federally required services within its current mobile cellular offering. It is undisputed that GCC meets the definition of a common carrier, but it does not presently advertise a universal service offering. The latter requirement was not the focus of the case before the PUC. Instead, the dispute centered on the provision of statutorily enumerated support services. GCC admitted that it did not presently provide a universal service offering or a package containing all of the federally required enumerated services. A GCC representative testified that its universal service offering would be "shaped by consumer preferences." GCC assumed that customers would want services and features comparable to those offered by traditional local exchanges, so access could be provided through a "wireless local loop service."[5] This wireless local loop would be supported by GCC's existing network infrastructure.[6] At the time of its application, GCC was not providing wireless local loop service to any customer in South Dakota.

[¶ 6.] GCC asserted that it could implement a universal service offering immediately upon designation. The PUC, however, was unconvinced of GCC's ability to provide the required services throughout the state. The commission noted that GCC had, at the time of the hearing, applied for ETC status in thirteen states. The PUC emphasized, "GCC admitted that it could not provide service to every location in South Dakota."

[¶ 7.] After the hearing, the commissioners unanimously voted to deny GCC's application. In its findings of fact and conclusions of law, the PUC ruled that "an ETC must be actually offering or providing the services supported by the federal universal support mechanisms throughout the service area before being designated an ETC." It also concluded: "Even if the Commission could grant a company ETC status based on intentions to serve, the Commission finds that GCC has failed to show that its proposed fixed wireless system could be offered to customers throughout South Dakota immediately upon being granted ETC status." GCC appealed to the circuit court under SDCL 1–26–30.2. After reviewing briefs and hearing oral argument, the court entered its own findings of fact and conclusions of law reversing the PUC and remanding the matter solely for a public interest determination for rural service areas. The PUC, SDITC, and Qwest appeal.[7]

---

5. A fixed wireless local loop service would provide customers with attributes more commonly associated with landline technology. This would allow customers to have a dial tone on their phones, not available with a traditional cellular unit. Furthermore, this fixed offering would permit customers to connect answering machines, fax machines, and other peripheral devices to their phone lines.

6. In their respective briefs to this Court, both the PUC and the South Dakota Independent Telephone Coalition emphasize that the credibility of this assertion is questionable in light of other statements by GCC. Both contend that GCC indicated a need to build additional towers and cell sites "to provide good quality." More accurately, the complete record reflects GCC's willingness to construct additional facilities and provide additional equipment "where necessary" to "optimize voice quality."

7. The three appellants in this case collectively present a total of eight issues:
 1. Whether an applicant for ETC designation must be providing or offering universal support services prior to obtaining designation.
 2. Whether the circuit court applied an improper standard of review.
 3. Whether the PUC was clearly erroneous when it found that GCC did not currently offer required universal support services through its existing cellular service at the time of its application.
 4. Did the PUC err when it determined that GCC could not provide universal services "throughout the service area?"
 5. Did the circuit court err in finding that GCC demonstrated an intent and ability to provide the required universal services throughout the State and provide such services upon designation?
 6. Did the circuit court erroneously find that the PUC has no authority to impose

### C.

[¶ 8.] In reviewing an agency ruling, we apply the same standard as the circuit court, with no assumption that the court's ultimate decision was correct. *Cheyenne River Sioux Tribe Tel. Auth. v. Public Utilities Comm'n*, 1999 SD 60, ¶ 12, 595 N.W.2d 604, 608 (citing *Appeal of Templeton*, 403 N.W.2d 398, 399 (S.D. 1987)). Questions of fact are reviewed with deference under the clearly erroneous standard. *Cheyenne River Sioux Tribe*, 1999 SD 60, ¶ 12, 595 N.W.2d at 608 (citations omitted). In this instance, our review of the circuit court's fact findings reverts to the PUC's findings because the court's fact findings were based solely on the record before the PUC. *Cf. State Div. of Human Rights v. Miller*, 349 N.W.2d 42, 46 n. 2 (S.D.1984). Questions of law, as well as mixed questions of law and fact, are fully reviewable. *Zoss v. United Bldg. Center, Inc.*, 1997 SD 93, ¶ 6, 566 N.W.2d 840, 843 (citing *Permann v. South Dakota Department of Labor*, 411 N.W.2d 113 (S.D.1987))(further citations omitted).

### D.

### Requirements for ETC Designation

[¶ 9.] To attain ETC designation, an applicant must: (a) be a common carrier; (b) *offer* certain supported services prescribed by the FCC in 47 C.F.R. § 54.101(a)(1)-(9);[8] (c) advertise the availability of the services and charges using media of general distribution; and (d) request an appropriate designated service

additional requirements for ETC designation beyond those provided for in 47 U.S.C. 214(e)(1)-(2)?
7. Did the circuit court err when it ordered the PUC to determine "based on the record" whether designation of GCC as an ETC was in the public interest?
8. Whether the public interest requirement under 47 U.S.C. 214(e) applies only to rural exchanges.
The central issue involves the interpretation of 47 U.S.C. 214(e). Because we affirm the circuit court's interpretation, we need not reach Issues 3 and 4.

area. *See* 47 U.S.C. 214(e)(1)(A)(B)(emphasis added); 47 U.S.C. 214(e)(2). Additionally, before designating an additional ETC in an area served by a rural telephone company, a state utility commission must find that the designation is in the "public interest." 47 U.S.C. 214(e)(2).

[¶ 10.] In interpreting these requirements, the PUC ruled that the word "offer" in 47 U.S.C. 214(e)(1)(A) requires a carrier to actually be "offering or providing" the enumerated services throughout the service area "before being designated an ETC." Thus, the commission concluded that it "cannot grant a company ETC status based on intentions to serve." The PUC also relied on the use of the present tense of the verb "meets" in 47 U.S.C. 214(e)(2): "the State commission may, in the case of an area served by a rural telephone company ... designate more than one common carrier as an [ETC] ... so long as each additional requesting carrier *meets* the requirements of paragraph (1)."

[¶ 11.] We interpret statutory provisions to learn the intent of the law. *De Smet Ins. Co. of South Dakota v. Gibson*, 1996 SD 102, ¶ 7, 552 N.W.2d 98, 100 (citations omitted). Where possible, congressional intent should be gleaned from the plain text of the statute. *Id.* When statutory language is clear and unambiguous we can simply declare the meaning as expressed. *Id.* Here, we face two possible readings of § 214(e)(1). On the one hand,

8. These enumerated services include: voice grade access, some amount of local usage free of charge, dual tone multi-frequency signaling or its functional equivalent, single-party service or its functional equivalent, access to emergency service (911 service), access to operator service, access to interexchange service, access to directory assistance, and toll limitation to qualifying low income consumers. *See* 47 C.F.R. 54.101(a)(1)-(9). Also, an ETC is obligated to make available Lifeline and Link Up services to qualifying low income customers. 47 C.F.R. 54.405; 47 C.F.R. 54.411.

the statute might be construed to require that an applicant presently provide or offer the required services before ETC designation. On the other hand, the requirement that a common carrier *offer* enumerated services and *advertise* those services could be understood as a post-designation condition. The statute says the offering and advertising must occur "throughout the service area for which the designation is *received*.... " 47 U.S.C. 214(e)(1)(emphasis added). The word "received" is in the past tense.

■ [¶ 12.] We must concede that both interpretations seem reasonable, which captures the very essence of ambiguity. Regrettably, the 1996 Act is rife with ambiguities, as the United States Supreme Court noted:

It would be gross understatement to say that the Telecommunications Act of 1996 is not a model of clarity. It is in many important respects a model of ambiguity or indeed even self-contradiction. That is most unfortunate for a piece of legislation that profoundly affects a crucial segment of the economy worth tens of billions of dollars.

*AT & T Corp.*, 525 U.S. at 397, 119 S.Ct. at 738, 142 L.Ed.2d 835. Our examination cannot verify from the text of § 214(e)(1) itself what Congress precisely intended. We must therefore go beyond plain language analysis to decide which interpretation more closely comports with congressional intent. In cases where a literal approach leaves us without a definitive interpretation, "the cardinal purpose of statutory construction—ascertaining legislative intent—ought not be limited to simply reading a statute's bare language; we must also reflect upon the purpose of the enactment, the matter sought to be corrected, and the goal to be attained." *De Smet Ins. Co.*, 1996 SD 102, ¶ 7, 552 N.W.2d at 100 (citations omitted).

■ [¶ 13.] ETCs are creations of the 1996 Act. *See* Pub.Law 104–104, Title I, § 102(a), 110 Stat. 80. Before this legislation, regulation of the telephone industry was "premised on the belief that only monopolies could provide reliable, universal service." *Cablevision of Boston, Inc. v. Public Improvement Comm'n of the City of Boston*, 184 F.3d 88, 97 (1st Cir.1999). The 1996 Act represents a substantial change in telecommunications regulation. *Id.* It seeks to encourage multiple providers and competition. *Id.* (citing Kearny & Merrill, The Great Transformation of Regulated Industries Law, 98 Column. 1323, 1325–26 (1998)).

[¶ 14.] Congressional desire to bring competition to this long-time monopolistic industry is explicit in the preamble to the 1996 Act: "An act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." *See* Pub.Law 104–104, 110 Stat. 56 (1996). *See also, Texas Office of Pub. Utility Counsel v. Federal Communications Comm'n*, 183 F.3d 393, 406 (5th Cir. 1999)(*cert. granted*, —— U.S. ——, 120 S.Ct. 2214, 147 L.Ed.2d 247 (2000)). We find it difficult to reconcile the PUC's interpretation of § 214(e)(1) with the thrust of the 1996 Act, promoting competition.

[¶ 15.] If common carriers must provide or offer all the universal services throughout the area at the time they seek designation, an onerous, perhaps overwhelming, burden would confront them. They would have to offer the enumerated services in high cost areas in competition with incumbent carriers without any assurance of support. Only after substantial investment and risk could a new carrier even seek designation, perhaps to later discover that it is not eligible. Such an interpretation gravely disadvantages applicant carriers, while fostering the very monopolies Congress sought to abolish.

[¶ 16.] Having in mind the congressional purpose behind the 1996 Act, the language of § 214(e)(1) tends to support a less restrictive reading. After all, obtain-

ing ETC status is only the first step in receiving support. Within § 214(e) Congress specifically provided that once ETC status is obtained, federal subsidies are not automatic. Instead, a carrier so designated "shall be *eligible* to receive universal service support...." *See* 47 U.S.C. 214(e)(1)(emphasis added). If a carrier wishes to receive subsidies it must follow through with its intentions. Indeed, the Federal Communications Commission declared that "a carrier's continuing status as an eligible carrier is contingent upon continued compliance with the requirements of § 214(e) and ... attracting and/or maintaining a customer base...." *In the Matter of Federal–State Joint Board on Universal Service, Report and Order*, 12 FCCR 8776, ¶ 138, 1997 WL 236383 (May 8, 1997)(*aff'd. in part and reversed in part, Texas Office of Pub. Utility Counsel v. FCC*, 183 F.3d 393 (5th Cir.1999)).

[¶ 17.] An ETC designation is not a guarantee of universal service support. A carrier must still provide the enumerated services required by federal law. In accord with 47 U.S.C. 214(e), an ETC is permitted to relinquish its designation in any area with more than one eligible carrier. 47 U.S.C. 214(e)(4). In doing so, the law requires the relinquishing ETC to provide the state commission with notice of its intent. *Id.* Notice is required so that the state commission can inform other carriers and "permit the purchase or construction of adequate facilities by any remaining [ETC]." *Id.* The express purpose of such a notice requirement is to ensure that all customers of the relinquishing ETC will continue to have universal services. *Id.* Thus, this section presupposes that ETCs may have to upgrade services even after designation.

[¶ 18.] Finally, the Federal Communications Commission has ruled on this very issue. After the South Dakota PUC denied ETC status to GCC, Western Wireless, GCC's parent company, sought a preemptive order from the FCC. In a declaratory ruling released on August 10, 2000, the FCC rejected the PUC's interpretation of § 214(e)(1), but declined to order preemption pending the outcome of this appeal.[9] The FCC held that "interpreting § 214(e)(1) to require the provision of service throughout the service area prior to ETC designation prohibits or has the effect of prohibiting the ability of competitive carriers to provide telecommunications service, in violation of § 253(a) of the Act." After designation as an ETC, the FCC ruled, a carrier must be given a reasonable opportunity to provide the services customers request.

[¶ 19.] It should be acknowledged, however, that the South Dakota PUC did not rule that applicant carriers must offer and provide required services before designation, only offer or provide them. The FCC did not recognize that distinction. Nevertheless, even if we retained some doubt on the proper construction of § 214(e)(1), we give a federal agency's interpretation of the statutes it administers highly deferential review. *Chevron USA v. Natural Resources De-*

**9.** *See In the Matter of Federal–State Joint Board on Universal Service, CC Docket No 96–45, Declaratory Ruling*, 15 F.C.C.R. 15168 (2000). GCC contends that this decision is binding as a result of the United States Supreme Court decision in *AT & T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). We do not interpret that case to so hold. Congress clearly gave the states the authority to designate ETCs. *See* 47 U.S.C. 214(e). Similarly 47 U.S.C. 152(b) indicates "nothing in this chapter shall be construed to apply or give to the Commission [FCC] jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication...." 47 U.S.C. 152(b).

The South Dakota PUC is unique in its interpretation of 47 U.S.C. 214(e)(1). To our knowledge, no other state utilities commission has interpreted it in a similar manner. *See e.g.* Western Wireless Corp. Designated Eligible Carrier Application, Findings of Fact and Conclusions of Law, PU–1564–98–428, ¶ 36, ¶ 8 (ND PUC 1999)(interpreting the statute in accord with the FCC's declaratory ruling).

*fense Council Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Consequently, we affirm the circuit court's interpretation of § 214(e) that a carrier need not be presently offering required services before qualifying as an eligible carrier. Likewise, inability to provide service immediately upon designation is not a basis for denying ETC status. New carriers, like incumbent carriers, are required to serve new customers on reasonable request. The PUC's contrary interpretation violates congressional intent to promote competition and unlock access to telecommunications markets.

### E.

### Providing Universal Service "Throughout the Service Area"

 [¶ 20.] The PUC denied GCC's application because § 214(e)(1) requires an ETC to offer supported services throughout the service area and advertise the availability of those services.[10] The PUC concluded that "GCC is not currently offering fixed wireless service nor is it advertising the availability of a fixed wireless service throughout South Dakota." Although the PUC acknowledged GCC's argument that current offering of services is not required, it found that such interpretation was contrary to the plain meaning of the statute. It is apparent from this language that the PUC determination that GCC did not meet the "throughout the service area requirement" was colored by its erroneous interpretation of § 214(e)(1). Consequently, after reviewing the record, we affirm the circuit court's ruling that GCC can within a reasonable time meet each of the ˙ requirements of § 214(e). Along with the court we too conclude that the record sufficiently demonstrates GCC's intent and ability to provide the required

enumerated services throughout South Dakota upon designation.

### F.

### Additional Requirements for ETC Designation

 [¶ 21.] SDITC argues that implicit in the circuit court's decision is a ruling that the PUC cannot impose additional requirements on a carrier seeking ETC status. The PUC's decision to deny GCC designation as an ETC did not hinge on any additional state requirement. The rationale for the PUC's denial is well summarized in one of its conclusions of law.

> The Commission finds that pursuant to 47 U.S.C. § 214(e), an ETC must be actually offering or providing the services supported by the federal universal service support mechanisms throughout the service area before being designated an ETC. GCC intends to provide a universal service offering initially through a fixed wireless system. However, it does not currently offer fixed wireless service to South Dakota customers. The Commission cannot grant a company ETC status based on intentions to serve.

 [¶ 22.] The circuit court made no specific finding that the PUC was without authority to compel further requirements. The challenged finding recited that

> [p]ursuant to 47 U.S.C. § 214(e)(2) the Commission is required to designate a common carrier that meets the requirements of Section 214(e)(1) as an ETC.... However, before designating an additional ETC for an area served by a rural telephone company the Commission must find that the designation is in the public interest.

This statement alone does not constitute a finding that the PUC is with or without such authority. Apparently, the circuit

---

10. The PUC asserted in its fourth issue that "[t]he circuit court erred in finding that the commission's decision required an applicant for ETC designation to show it is providing a universal service offering *to every location* in the requested designated service area." We decline to address the propriety of the circuit

court's construction in light of our scope of review. *See Cheyenne River Sioux Tribe*, 1999 SD 60, ¶ 12, 595 N.W.2d at 608 (citations omitted). We review agency findings, as did the circuit court with no presumption that the circuit court was correct. *Id.*

court took the PUC at its word that there were no additional requirements. This Court will not pass on an issue not decided by the circuit court. *Matter of Guardianship of Petrik*, 1996 SD 24, ¶ 11, 544 N.W.2d 388, 390 (citations omitted).[11]

### G.
### No "Public Interest" Finding for Non–Rural Exchanges

■■■ [¶ 23.] Qwest Corporation alone contends that under the 1996 Act a state utilities commission must make a separate public interest determination before granting ETC status in all telephone exchanges, rural and non-rural. The relevant portion of the statute provides:

> Upon request and consistent with the public interest, convenience, and necessity, the State commission may, in the case of an area served by a rural telephone company, and *shall*, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by the State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

47 U.S.C. 214(e)(2)(emphasis added). Qwest's position contradicts the plain reading of this section.

[¶ 24.] The portion of the statute addressing non-rural exchanges provides that "consistent with the public interest, convenience, and necessity, the State commission ... *shall*, in the case of all other areas, designate more than one common carrier ... so long as each additional requesting carrier meets the requirements of paragraph (1)." 47 U.S.C. 214(e)(2)(emphasis added). The PUC *must* designate an additional ETC in a non-rural exchange so long as the requesting carrier "meets the requirements of paragraph (1)." The phrase "consistent with the public interest, convenience, and necessity" when read with the mandatory "shall" expresses the congressional premise that in non-rural exchanges the existence of more than one ETC is in the public interest.

[¶ 25.] The last sentence of this section further weakens Qwest's position. In that sentence, Congress expressly provides that before designating an additional ETC in a rural exchange, the commission "shall" determine if the designation is in the public interest. *See* 47 U.S.C. 214(e)(2). If Congress had intended to require such a finding in all telephone exchanges, whether rural or non-rural, it could have easily so declared. Qwest's interpretation cannot be sustained.

### H.
### "Public interest" Finding for Rural Exchanges

■■■ [¶ 26.] For ETC designation in rural exchanges, a state utilities commission is expressly required to find whether the designation of an additional telecommunications carrier is in the public interest. "Before designating an additional [ETC] for an area served by a rural telephone company, the State Commission shall find that the designation is in the public interest." 47 U.S.C. 214(e)(2); *see also* SDCL 49–31–78. Because it found that GCC was not currently offering or providing the necessary services to support the granting of ETC designation, the PUC ruled that "it need not to reach the issue of whether granting ETC status to GCC in areas served by rural customers is in the public interest." The circuit court remanded this matter for a determination based on record evidence. Although we do not wish to hamstring the PUC by unreasonably limiting its oversight of the tele-

---

**11.** Although we decline to reach the merits of SDITC's claim, it is worth mentioning that even if a state commission does retain authority to impose additional requirements, any such requirements must be competitively neutral and consistent with the Act's aim of promoting competition. *See* 47 U.S.C. 253(b).

communications industry, we think it vital that there be as little delay as possible in allowing GCC to begin operations in South Dakota. This matter has been delayed for years. Evidence was submitted in 1998 on the public interest question and the issue would have been reached then if the inquiry had not been aborted due primarily to an erroneous application of federal law. Therefore, if based on record evidence the PUC finds that the public interest test has been satisfied in the rural areas where GCC is seeking ETC status, then the PUC must award such designation in those areas.

[¶ 27.] We affirm the circuit court in all respects.

[¶ 28.] MILLER, Chief Justice, and SABERS, AMUNDSON, and GILBERTSON, Justices, concur.