2001 SD 84

**CITY OF FREEMAN, A Municipal Corporation under the Laws of the State of South Dakota, Plaintiff and Appellant,**

v.

**Richard A. SALIS and Barbara L. Salis, Defendants and Appellees.**

**Nos. 21640, 21738.**

Supreme Court of South Dakota.

Argued May 30, 2001.

Decided June 27, 2001.

Rehearing Denied Aug. 14, 2001.

Dale L. Strasser, Freeman, SD, Michael J. Schaffer of Davenport, Evans, Hurwitz and Smith, Sioux Falls, for plaintiff and appellant.

Kent E. Lehr, Scotland, for defendants and appellees.

KONENKAMP, Justice

[¶ 1.] The circuit court dismissed a municipal petition for condemnation, ruling that the city council acted in bad faith and abused its discretion in resolving to condemn private property. Because the challenged conduct in this case cannot be classed as an abuse of discretion or bad faith under SDCL 21–35–10.1, we reverse the dismissal and order reinstatement of the condemnation action.

### A.

[¶ 2.] Richard and Barbara Salis own a home in Freeman, South Dakota. In 1996, they paid $1000 for a strip of railroad property adjoining their lot. This three and one-third acre corridor is approximately 100 feet wide and 1300 feet long. It lies north of the Salis home, and its trees form a windbreak. For the Salises, "there's a lot of enjoyment in [the strip] because of the . . . wildlife" and the esthetic vista the trees afford. Running through a section of the strip is a ditch that serves the drainage flow from western Freeman.

[¶ 3.] In the spring of 1997, following a heavy winter snowfall, Freeman experienced substantial flooding. The City hired Vern Arens, a licensed professional engineer, to perform a surface water drainage study. He concluded that the drainage channel on the Salises' strip needed improvement. Water backed up causing flooding because "trees and shrubs that [are] on the [strip] itself right now [are] a

hindrance to the transgressional flow of run-off through the property itself."

[¶ 4.] With the engineer's recommendation, the City negotiated with the Salises to clear the drainage ditch of trees and shrubs. Not wanting the City to "clear-cut" the property, the Salises sought to preserve the wildlife and vegetation as much as possible. Their negotiations resulted in a Memorandum of Understanding.[1] The city attorney drafted the document, and the parties signed it on June 15, 1998. For approximately a year afterwards, the City did nothing.

[¶ 5.] In September 1999, a Freeman employee arrived in a payloader with an eight-foot bucket to begin work. His assignment was to "clean the ditch out, anything in the ditch and anything overhanging the ditch into the ditch that was going to hit the loader. . . ." City authorities concede that they did not tell their employee about the specific terms of the Memorandum. Nor did they notify the Salises before beginning the work. Richard Salis became aware of the City's action when his wife told him that she heard branches breaking. He went outside to investigate and saw that the payloader had destroyed trees that he believed were protected under the terms of the Memorandum. He demanded that the employee stop. Since that time, the City has made no further attempts to clear the drainage ditch. Brief negotiations followed.

[¶ 6.] The Salises insisted that the City breached the Memorandum and demanded

compensation. In the course of negotiations, they offered to lease the strip of land to the City for twenty-five years for a fee of $35,000. The City rejected a lease, but offered to replace two trees. The Salises found that offer unacceptable. The City then offered to purchase the land for $3000. The Salises responded that they would accept $3000 as damages, would negotiate to clarify the terms of the Memorandum, and would submit the dispute to a mediator. After this, the council passed a resolution of necessity for condemnation. According to the mayor, the City "[did] not want to be here every other year or every third year discussing the Memorandum of Understanding" or "take the risk of being liable for past and possibly future damages." The council's resolution for condemnation set aside $3000 for acquisition costs and sought only to take approximately so much of the property as the drainage ditch ran through.

[¶ 7.] In response to the City's condemnation petition, the Salises answered and counterclaimed for damages. They challenged the City's right to condemn. Following a hearing, the circuit court found that in passing its resolution of necessity, the City acted in bad faith and abused its discretion under SDCL 21–35–10.1. The judge wrote:

> This court finds it offensive that the city can enter into an agreement, fail to live up to the agreement, and then arbitrarily condemn the property. The city demonstrated it was operating in bad faith

1. The Memorandum of Understanding provided in part:

   The owners allow the City to enter upon the premises to clean the existing drainage channel by removing any growth in the channel, removing any overhanging branches, limbs and fallen trees over the channel so as to allow water to flow freely through the channel and exiting the owner's property.

   The City will not remove any growth on the south side of the channel but can remove any dead trees and branches that may be in the channel that lays or leans across to the south side of the channel.

   The owners allow the City to remove any dead trees and branches on the north side of the channel. The owners also allow the City to remove any growing trees or shrub that is less than 3 inch in diameter.

when it negotiated the agreement, bad faith when it cleared out the ditch and bad faith when it condemned the Salis property.

The court dismissed the petition for condemnation. The City appeals.

### B.

[¶ 8.] Before addressing the substantive issues, we must set the standard of review. We have not addressed the standard before, and there exists some confusion in the law on the proper scope of review for condemnation appeals. *See Dep't of the Interior v. 16.03 Acres of Land,* 26 F.3d 349, 355 (2nd Cir.1994). A standard deferential to municipal police power seems consistent with the wide discretion afforded to condemning authorities. *See* SDCL 21–35–10.1. The power of eminent domain embodies an aspect of sovereignty as an "offspring of political necessity." *Bauman v. Ross,* 167 U.S. 548, 574, 17 S.Ct. 966, 976, 42 L.Ed. 270 (1897); *United States v. Gettysburg Electric Ry. Co.,* 160 U.S. 668, 681–82, 16 S.Ct. 427, 429–30, 40 L.Ed. 576 (1896).[2] Many federal courts apply an arbitrary and capricious standard in these cases. *See 16.03 Acres of Land,* 26 F.3d at 355. Likewise, we have long held that in municipal decision making, the scope of review is limited to whether a city acted unreasonably and arbitrarily. *Evans v. King,* 57 S.D. 109, 230 N.W. 848, 849 (1930); *Ericksen v. City of Sioux Falls,* 70 S.D. 40, 53, 14 N.W.2d 89, 95 (1944). We believe this standard is mandated by the separation of powers doctrine guiding judicial review of government actions. *City of Mobridge v. Brown,* 39 S.D. 270, 164 N.W. 94, 94–95 (1917); *see Foss v. Spitznagel,* 77 S.D. 633, 644, 97 N.W.2d 856, 862 (1959).

[¶ 9.] A city's resolution of necessity is a governmental policy decision entitled to substantial deference. *See generally,* 2 Childress and Davis, Federal Standards of Review § 17.04 (discussing the highly deferential review of policy decisions). Consequently, the City of Freeman's decision should be reviewed under the abuse of discretion standard. On the other hand, we review the circuit court's decision *de novo* without any presumption that its ultimate ruling was correct. *Filing by GCC License Corp. For Designation as an Eligible Telecomm. Carrier,* 2001 SD 32, ¶ 8, 623 N.W.2d 474, 479 (citations omitted); *see also City of Jamestown v. Leevers Supermarkets, Inc.,* 552 N.W.2d 365, 370 (N.D.1996).[3] Of course, the circuit court's factual findings are examined under the clearly erroneous standard. *GCC License Corp.,* 2001 SD 32, ¶ 8, 623 N.W.2d at 479.

### C.

[¶ 10.] Our law vests municipalities with broad authority in deciding when the taking of property is necessary for public purposes. *See Basin Electric Power Coop. v. Payne,* 298 N.W.2d 385, 386 (S.D.1980) (citations omitted). Necessity is not a judicial question: a city's decision to condemn is binding absent fraud, bad faith, or an abuse of discretion. *See* SDCL

---

**2.** *See generally* David E. Gilbertson, Condemnation of Agricultural Land in South Dakota, 20 SDLRev 623 (1975).

**3.** The Supreme Court of Oregon enunciated a similar standard: "[w]hether there was an abuse of discretion [in condemnation proceedings] is a question of law for the court." *Port of Umatilla v. Richmond,* 212 Or. 596, 321 P.2d 338, 351 (1958). That court also concluded that it was not bound by a trial court finding that the challenged taking was in excess of the condemning authority's needs. *Id. Cf. Commonwealth v. Taub,* 766 S.W.2d 49, 52–53 (Ky.1988)(reviewing trial court's determination of abuse of discretion or bad faith under a clear error standard).

21–35–10.1. *See also* 11 McQuillin, Municipal Corporations 351–353 (3d ed. 2000)(describing the general rule). Challengers shoulder the burden of proving abuse or bad faith and overcoming the strong presumption that the condemnor acted lawfully. *Id.* at 357; *In re Condemnation of Property of Waite,* 163 Pa.Cmwlth. 283, 641 A.2d 25, 28 (1994) (citations omitted). In reviewing the Salises' allegations of bad faith and abuse of discretion, we consider all relevant conditions existing at the time of the resolution of necessity. *Sullivan v. City of Ulysses,* 23 Kan.App.2d 502, 932 P.2d 456, 457 (1997) (citations omitted).

[¶ 11.] We have yet to examine the concept of bad faith in the context of condemnation proceedings under SDCL 21–35–10.1. The circuit court defined it as "that which imports a dishonest purpose and implies some wrongdoing or some motive of self interest." Although this definition is accurate for some contexts, it is inadequate as applied to a condemning authority in the exercise of its power of eminent domain. In similar proceedings, bad faith has been more sharply defined as conscious wrongdoing motivated by improper interest, ill will, or dishonest intent. *City of Atlanta v. First Nat'l Bank of Atlanta,* 246 Ga. 424, 271 S.E.2d 821, 822 (1980)(footnoted information omitted).

[¶ 12.] Courts may not lightly attribute improper motives to cities and their council members where valid reasons exist to support condemnation. *Pheasant Ridge Associates Ltd. Partnership v. Burlington,* 399 Mass. 771, 506 N.E.2d 1152, 1156 (1987). A municipality acts in bad faith when it condemns land for a private scheme or for an improper reason, though the superficially stated purpose purports to be valid. *Id.* at 1156. In most instances, of course, this type of bad faith must be shown by circumstantial evidence. Some signifiers include absence of prior interest

in the site, failure to act in conformity with usual practices, and indications of intent to use the property for purposes not cited in the resolution. *Id.* at 1157.

[¶ 13.] Even accepting the circuit court's factual findings unreservedly, we still cannot hold that the City's actions constituted bad faith under SDCL 21–35–10.1. The court based its ruling on the following: breaching the Memorandum, failing to inform the employee of the Memorandum's terms, waiting a year before attempting to clear the ditch, and refusing to go back to the terms of the Memorandum and mediate. The court viewed the mayor's statement that condemnation proceedings were instituted to avoid present and future liability under the agreement as a mark of bad faith.

[¶ 14.] Breach of the Memorandum does not alone evince bad faith. *See generally McKie v. Huntley,* 2000 SD 160, ¶¶ 13–15, 620 N.W.2d 599, 603. Nor does delay in clearing the channel establish arrant wrongdoing. Cities are charged with many contract obligations, each exacting an allocation of resources. These are rarely proper subjects for judicial review. An effort to avoid extended litigation or repeated negotiations with the same property owners may prove nothing more than fiscal prudence, rather than bad faith. *See Stubbs v. Snyder Township,* 25 Pa. Cmwlth. 613, 361 A.2d 464, 465–66 (1976); see also *Hendrickson v. Wagners Inc.,* 1999 SD 74, ¶ 21, 598 N.W.2d 507, 511–12 (impractical remedy to be forced to seek successive relief rather than final resolution).

[¶ 15.] The Salises highlight the City's breach of the Memorandum and its failure to attempt further resolution as proof of bad faith. We must decide what legal effect the Memorandum had on the City's ability to later undertake condemnation

proceedings. Some jurisdictions, by statute, require authorities to seek a negotiated agreement before condemning property. 11A McQuillin, *supra* at 219. In those jurisdictions, a failed agreement will not preclude subsequent condemnation. *Id.* at 222. Although negotiation and agreement are usually preferable to litigation, we have no equivalent statutory requirement. *See* SDCL 9-27-1; *see also Basin Electric Power Coop.*, 298 N.W.2d at 386 (recognizing that the condemnation proceeding was instituted after failed negotiations). It can hardly be said that failure to continue negotiations denotes bad faith, especially here where the parties arrived at a written understanding but could not agree on the meaning of its terms. Furthermore, to hold otherwise suggests that cities can inadvertently contract away the right to condemn property. *See Ericksen*, 70 S.D. at 53, 14 N.W.2d at 95 (a city cannot contract away its police power).

[¶ 16.] A hallmark of bad faith in condemnation proceedings is the use of the power of eminent domain for an improper purpose. Clearing the drainage ditch for flood control was always the City's intent, a valid goal for any community. *Cf. Burlington*, 506 N.E.2d at 1157; *Earth Management, Inc. v. Heard County*, 248 Ga. 442, 283 S.E.2d 455, 460–61 (1981). The Salises do not dispute this necessity. They agreed that vegetation in the channel could "impede the water if growth was there." The City condemned only so much of the property needed to widen and clear the drainage ditch. From first negotiating the Memorandum to finally resolving to condemn, every action the City undertook was consistent with its intent to clear the ditch as a preventive measure. Following work stoppage at the insistence of the Salises, the parties negotiated for over a month before the City passed its resolution of necessity. During these negotiations, the City offered to purchase the property,

but the Salises refused. The City had a lawful public purpose for proceeding with condemnation despite its decision to abandon continued negotiations. Its resolution cannot be classified as bad faith.

### D.

[¶ 17.] In addition to bad faith, the circuit court ruled that the City abused its discretion in choosing to condemn. The court found that the City was "angry with threats [by the Salises] to sue it for damages for ... breach of the Memorandum of Understanding." Thus, the court concluded that the City's decision violated "fact and logic and evidence not in the exercise of will but perversity of will, not the exercise of judgment but the defiance thereof, not the exercise of reason but rather of passion or bias." In *Basin Electric Power Coop.*, we recognized the broad discretion granted to condemning authorities. 298 N.W.2d at 386. Such discretion extends not only to findings of necessity but also to selections of location. *Id.* The City faced competing considerations: continue to negotiate the terms of the Memorandum or condemn the subject property. Without final resolution, petty disputes over how to clear the ditch might persist every year.

[¶ 18.] When condemning authorities face competing considerations, they do not abuse their discretion if their choices are reasonable in light of logic and evidence. *Id.* at 388. A choice to condemn must grossly violate fact and logic or be wholly arbitrary to support a finding of abuse. *Id.*; *Red River Waterway Comm'n v. Fredericks*, 566 So.2d 79, 83 (La.1990) (citations omitted). Considerations of alternative routes, project costs, environmental factors, and safety concerns may indicate that the decision was not arbitrary

but within the range of reasonable discretion. *Id.*

[¶ 19.] To the Salises, the City could have cleared the ditch without resorting to condemnation if it had only continued to negotiate; therefore, the decision to condemn was an exercise of passion and anger instead of reason and logic. Yet it is clear that these parties could not agree on the meaning of the terms in the Memorandum. The Salises "assumed" that overhanging branches would be removed with a "chainsaw," not an "end loader." No mention of an agreed method for extraction can be found in the Memorandum. The Salises stood on their position that if the parties proceeded under the Memorandum and they disagreed with the City's methods, they would prohibit further work.

[¶ 20.] Taking into account these differing interpretations, the City was concerned about "past and possibly future damages" if it attempted to proceed under the original Memorandum.[4] The mayor explained the City's need for finality as the reason for choosing condemnation: "We do not want to be here every other year or every third year discussing the Memorandum of Understanding or saying the water backed up again.... We want to solve the problem." Avoiding protracted negotiation or litigation and concerns of expense and public safety assuredly fall within the range of governmental discretion. *See Stubbs,* 361 A.2d at 465–66 (citations omitted). At best, any suggestion of abuse of discretion can be found only by supposing that anger or impatience animated council members after negotiated attempts to clear the ditch appeared time consuming or futile. These are not sufficient to constitute an abuse of discretion.

4. The circuit court found that the City destroyed some trees intended to be preserved under the Memorandum of Understanding.

E.

[¶ 21.] The circuit court awarded the Salises their costs and attorney's fees under SDCL 21–35–22. By statute, whenever eminent domain proceedings are dismissed with or without prejudice the party seeking condemnation becomes liable for such expenses. Because we reverse the decision of the circuit court, we also reverse the award of costs and fees. For the same reason, we deny the Salises' request for appellate attorney's fees.

[¶ 22.] Reversed and remanded with instructions to reinstate the condemnation action.

[¶ 23.] MILLER, Chief Justice, and SABERS, AMUNDSON, and GILBERTSON, Justices, concur.

However, the Salises' claim for compensation for breach of contract is not at issue in this appeal.