2003 SD 97

**CITY OF RAPID CITY, a municipal corporation, Appellant,**

v.

**Daniel J. FINN, Jr. and Melinda K. Finn, Appellees.**

No. 22531.

Supreme Court of South Dakota.

Argued on April 29, 2003.

Decided Aug. 6, 2003.

Adam Altman, City Attorney, Michael S. Booher, Assistant City Attorney, Rapid City, South Dakota, Attorneys for appellant.

Edward C. Carpenter of Costello, Porter, Hill, Heisterkamp, Bushnell & Carpenter, Rapid City, South Dakota, Attorneys for appellees.

MEIERHENRY, Justice.

[¶ 1.] The City of Rapid City (City) filed a petition against Daniel and Melinda Finn (Finn), owners of Lot 23, seeking to condemn a portion of Lot 23. An action for declaratory judgment had already been brought by Wildwood Association against the City, Leo Hamm Ranch, L.L.C., Harley Taylor, and Red Rock Development Co., L.L.C. to determine the status of the property the City wished to condemn and whether the section line had been vacated. The trial court combined the actions. In regard to the condemnation action, the trial court ruled against the City. The City appeals. We affirm.

## FACTS

[¶ 2.] Wildwood subdivision was platted in 1978 and 1979. Wildwood is bordered on the south by the section line that separates section 21 and 28 of Township 1 North, Range 7 East, Black Hills Meridian, Pennington County. Five lots lie north of the section line and are immediately adjacent to it. The condemnation action concerned mainly Lot 23 owned by Daniel and Melinda Finn. Lot 23 is burdened with a sixty-six foot access easement. The access easement and the section line are known as Shooting Star Trail.

[¶ 3.] The 1978 plat labeled a parcel of land across Lot 23 as "66' Access Easement." Sometime in 1985, Leo Hamm (Hamm) sought to purchase the access easement for the purpose of dedicating it to the public. When the City informed Hamm that he would be required to pave the easement, Hamm abandoned the idea. Approximately a year later, Hamm once again approached the City about the easement; the City informed him that in order to dedicate the easement as a public right-of-way, a drainage study was required. Hamm once again abandoned the idea.

[¶ 4.] The City's decision to condemn Finn's property was prompted by a series of events beginning with discussions about the City providing municipal services to a development identified as Red Rock Estates. In order for the City to provide services to Red Rock Estates, the City would have to annex the development. Hamm's property lay between and adjacent to the City limits and Red Rock Estates. Because Red Rock Estates was not contiguous to the City, negotiations began

with Hamm for his consent to annex his property. Hamm conditioned the voluntary annexation of his property on a number of demands. Ultimately, an agreement was struck with Hamm: (1) Red Rock Estates would pay Hamm $50,000, (2) the City would obtain, at its expense, a sixty-six foot easement from Wildwood to the section line, (3) the City would dedicate the easement as a public right-of-way, and (4) the City would grade the section-line road along the northern boundary of Hamm's property according to City specifications.

[¶ 5.] Neither Finn nor Wildwood property owners were notified or included in the City's discussions with Hamm. In fact, Hamm specifically directed the City not to contact Daniel or Melinda Finn. It was not until approximately a year after the City initiated the agreement with Hamm that the residents of Wildwood became aware it.

[¶ 6.] On July 10, 2000, the City passed a resolution incorporating the conditions of the Hamm agreement for annexing his property. On August 21, 2000 the City annexed Hamm's property. The City attempted to procure the access easement from Finn without success. On March 5, 2001, the City filed a petition for condemnation against Finn to obtain the access easement for public use. On September 19, 2001, the City adopted a resolution of necessity for the condemnation. The City determined that the sixty-six foot access easement was necessary to provide access to the section line in order to facilitate public travel.

[¶ 7.] At trial, the trial court ruled in favor of Finn finding that the City had acted in bad faith and abused its discretion in filing a petition to condemn. The City appeals the following issues:

1. Whether the City's finding of necessity for condemnation of Finn's property was based on bad faith.
2. Whether the City's finding of necessity for condemnation of Finn's property was an abuse of discretion.

## STANDARD OF REVIEW

[¶ 8.] The proper scope of review for condemnation appeals is a standard deferential to the municipal police power. City of *Freeman v. Salis,* 2001 SD 84, ¶ 8, 630 N.W.2d 699, 702. "[I]n municipal decision making, the scope of review is limited to whether a city acted unreasonably and arbitrarily." *Id.* (citing *Evans v. King,* 57 S.D. 109, 230 N.W. 848, 849 (1930); *Ericksen v. City of Sioux Falls,* 70 S.D. 40, 53, 14 N.W.2d 89, 95 (1944)). A city's resolution of necessity is entitled to substantial deference and should be reviewed under an abuse of discretion standard. *Id.* at ¶ 9. The trial court's findings of fact are reviewed under a clearly erroneous standard and questions of law as well as mixed questions of law and fact are reviewed *de novo.* *Id.*

## DECISION

1. Whether the City's finding of necessity for condemnation of Finn's property was based on bad faith.

[¶ 9.] The trial court found that the City acted in bad faith when it initiated a condemnation proceeding against Finn. The City contends that the condemnation resolution was valid and based on necessity. The City denies any basis of fraud, bad faith, or abuse of discretion. The property owner's right to challenge the City's taking is set forth in SDCL 21–35–10.1 which states:

Within thirty days from the date the summons described in § 21–35–9 is served, the defendant may demand a

hearing in circuit court on the petitioner's right to take. Failure to make such demand or to consent in writing to the taking, within the thirty-day period, shall constitute a waiver of the right to question the necessity of the taking. *The finding of necessity by the plaintiff, unless based upon fraud, bad faith or an abuse of discretion, shall be binding on all persons.*

(Emphasis added.)

[¶ 10.] The City asserts that the trial court erred in determining that the condemnation proceeding was to further a private interest and that the City acted in bad faith. The City contends that the evidence established that it was in the public interest to condemn the access easement across Lot 23 in order to facilitate public travel.

■■■ [¶ 11.] This Court has said that "[a] municipality acts in bad faith when it condemns land for a private scheme or for an improper reason, though the superficially stated purpose purports to be valid." *Salis,* 2001 SD 84, ¶ 12, 630 N.W.2d at 703. The use of eminent domain solely to benefit a private individual or individuals constitutes bad faith and the taking is void. *Pheasant Ridge Associates Ltd. Partnership v. Burlington,* 399 Mass. 771, 506 N.E.2d 1152, 1155 (1987) (citations omitted).

[¶ 12.] In determining that the City acted in bad faith, the trial court relied on the following findings: (1) that the City made an agreement with Hamm to obtain the sixty-six foot access easement; (2) that no notice of the agreement between the City and Hamm was provided to the owners of Lots 18 through 23 or to Wildwood Association; (3) that an e-mail evidenced a deliberate decision not to contact Daniel

and Melinda Finn; (4) that prior to this agreement, the City had demonstrated no interest in the property it ultimately sought to condemn; and (5) that the City, in an attempt to purchase Finn's property, made contradictory representations about the location of the access from Wildwood to Hamm's property and Red Rock Estates. In addition, the trial court found that the City failed to act in conformity with its usual practice of performing traffic studies, engineering studies and drainage studies before instituting a condemnation action. The trial court also based its decision on the City's failure to specifically identify the location of the sixty-six foot access to be condemned and the change of its location and width immediately before trial.

■■■ [¶ 13.] At trial, the evidence established that for 20 years the City held the position that no roads extending into Wildwood subdivision should be built because of the geographical nature of the land. A 1978 staff report stated that "[a]fter investigation of future development potential and proposed road grades, it is the staff's recommendation that a collector system[1] not be extended through this development.". Several years prior to the condemnation proceeding, Hamm tried, on two separate occasions, to obtain the easement for dedication to public use. The City informed Hamm that in order to dedicate the easement across Lot 23 to public use, he would have to pave the easement and do drainages studies. On both occasions, Hamm abandoned his plan.

[¶ 14.] It was not until Red Rock Estates began negotiating with Hamm that the City became interested in Finn's property. It was only after Hamm demanded that the City obtain the easement for pub-

---

1. A street identified as a "collector" street means additional traffic from future developments could come through the neighborhood for ingress and egress.

lic dedication that the City chose to acquire Finn's property. Despite the City's prior position that a collector system should not be extended through Wildwood, it decided to make a deal with Hamm to obtain the access easement for public use. In a letter dated April 7, 2000, the mayor acknowledged Hamm's demand and responded, "I am willing to pursue City acquisition and if necessary condemnation to acquire that land." At a public meeting held July 19, 2001, the mayor made it clear that the City would be condemning part of Lot 23 stating, "[t]he City has made the commitment to Leo Hamm and I fully intend to see that it's carried out."

[¶ 15.] During the negotiations with Hamm, the City gave no notice to Finn or to the Wildwood property owners. In fact, information about the negotiations was purposely withheld from Finn. In an e-mail from Marcia Elkins (Elkins), City Planning Director, to the mayor, Elkins informed the mayor that Hamm did not want the City to approach Daniel and Melinda Finn at that time. On September 25, 2000, Bonnie Hughes (Hughes), Community Development Director for the City, sent a letter to Finn expressing the City's desire to obtain the access easement for dedication as a public right-of-way. Hughes made no mention of the deal with Hamm. Finn called Hughes to inquire further about the future of the access easement. After speaking to two of the City's engineers, Hughes told Finn that the major street plan had been amended to show Wildwood Drive as a local street only—meaning access through the area for future development would not be allowed. The engineers also told Hughes that, in their opinion, it was a poor place to put a road and that the proper location would be farther south. In a letter dated March 23, 2000, Hughes again indicated to Finn the City's desire to purchase the property. Included in the letter was Hughes' assurance that the major street plan showed Wildwood as a local street only and that access through the area to future developments would not be allowed.

[¶ 16.] The Wildwood residents first discovered that a road was being constructed from Red Rock in the direction of Shooting Star Trail in June of 2001. Again Finn called Hughes who assured Finn that any road coming in that direction would divert south and would join Sheridan Lake Road. In late June as the construction progressed further, another resident of Wildwood found construction workers putting stakes in his back yard as Hamm stood nearby watching. The resident went to the city engineers who informed him that no permits had been issued for road construction in that area. Without a permit the City was forced to stop construction. Despite the City's clear intention to build a road on Shooting Star Trail, the city engineers at a July 2, 2001 meeting still maintained that there were no plans to build a road on Shooting Star Trail. Apparently, the city engineers were not privy to the deal between Hamm and the City or that a road had, in fact, been planned. The agreement between Hamm and the City to build a road across Lot 23 to the section line had the appearance of a private agreement since neither the Wildwood residents nor the City's own engineering departments were notified.

[¶ 17.] Additionally, the City failed to conform to its usual practices in condemning property. The City's Public Works Director admitted that the City usually conducts a preliminary engineering evaluation to determine the feasibility of a road at the proposed location. The City Project Manager agreed. Contrary to its normal procedure, the City condemned the property without determining whether a street would meet any of the required standards.

[¶ 18.] Despite the City's contention that the condemnation of Finn's property was necessary to facilitate public travel, the evidence indicates otherwise. The main purpose of the condemnation was to fulfill the City's commitment to Hamm. The City's actions in furthering Hamm's private interest were improper. Based on the evidence, we cannot say that the trial court's findings of fact were clearly erroneous. Nor do we find the trial court erred in concluding that the condemnation action was instituted in bad faith.

2. **Whether the City's finding of necessity for condemnation of Finn's property was an abuse of discretion.**

[¶ 19.] The trial court found that the City abused its discretion in finding necessity as a basis to condemn the Finn's property. "(M)uch latitude is given to the corporation vested with the right of acquiring property by eminent domain to determine the extent of the property necessary to be taken...." *Basin Elec. Power Co-op. v. Payne*, 298 N.W.2d 385, 388 (S.D. 1980) (citing *Otter Tail Power Company v. Malme*, 92 N.W.2d 514, 521 (N.D.1958)). This Court has said, "[w]hen condemning authorities face competing considerations, they do not abuse their discretion if their choices are reasonable in light of logic and evidence." *Salis*, 2001 SD 84, ¶ 18, 630 N.W.2d at 704. "A choice to condemn must grossly violate fact and logic or be wholly arbitrary to support a finding of abuse of discretion." *Id.*

[¶ 20.] The trial court found that the City abused its discretion in condemning Finn's property because there was no public necessity for the taking. The City claims that the condemnation was necessary to provide access to the section line and to facilitate public travel. As early as 1978, the City was aware of the difficulties it would face by building a road for ingress and egress from Wildwood to other developments. A 1978 staff report indicated that after investigation of development potential and proposed road grades, the engineer recommended that a collector system be developed from the north, Corral Drive, and from the south, Sheridan Lake Road. Knowing that a prior report recommended no extension of collector streets in Wildwood, the City proceeded with its plan to extend the street without conducting further studies to determine whether a road on the access easement was feasible. No geotechnical analysis, drainage studies, or traffic studies were conducted by the City. The City presented no roadway plans prior to condemning the property. Although the City had previously told Hamm that it required a drainage study in order to consider his request to dedicate the easement to the public, the City did no drainage study before condemning the property.

[¶ 21.] Evidence at trial revealed that a road built on the condemned sixty-six foot easement could not meet City standards. The road would not meet standards because: (1) a street would create "double front" lots, (2) the proposed road would extend ten feet into Finn's home, and (3) the geographical terrain would not accommodate a road that would meet City standards. Two of the City Engineers indicated it was a poor place to put a road. Eventually, the City was forced to concede that a road could not be built to City standards within the sixty-six foot easement. The City Project Manager admitted that in order to construct a street that would meet City specifications, the street would have to be relocated and would encompass far more than the sixty-six foot access easement. Notwithstanding the road's relocation and widening, the street still may not meet the minimum standards.

[¶ 22.] Based upon the evidence, we cannot say that the trial court's findings

were clearly erroneous. Nor can we say that the trial court erred in concluding that the City abused its discretion in finding public necessity as a basis for the taking.

[¶ 23.] We affirm.

[¶ 24.] GILBERTSON, Chief Justice, and SABERS, and ZINTER, Justices, and SRSTKA, Circuit Judge, concur.

[¶ 25.] SRSTKA, Circuit Judge, sitting for KONENKAMP, Justice, disqualified.

SRSTKA, Circuit Judge (concurring).

[¶ 26.] I concur in the majority opinion in all respects. I add this opinion to comment on SDCL 21–35–10.1 and our affirming the use of that statute by the trial court to overturn a city's declaration of taking.

[¶ 27.] At first blush our opinion appears to beat a retreat from the traditional deference given by the courts to the legislative branch of the government when it delegates the power of eminent domain. *Basin Elec. Power Co-op. v. Payne,* 298 N.W.2d 385, 388 (S.D.1980)(citing *Otter Tail Power Company v. Malme,* 92 N.W.2d 514, 521 (N.D.1958)).

[¶ 28.] The Constitution of South Dakota, art. VI, § 13, and art. XVII, § 18, by implication if not direction, limit the use eminent domain to acquire property in the public interest.

[¶ 29.] Article VI, § 13 reads in part: "Private property shall not be taken for public use, or damaged, without just compensation, which will be determined according to legal procedure established by the legislature and according to § 6 of this article."

[¶ 30.] Article XVII, § 18, reads in part:

Municipal and other corporations and individuals invested with the privilege of taking private property for public use shall make just compensation for property taken, injured or destroyed, by the construction or enlargement of their works, highways or improvements, which compensation shall be paid or secured before such taking, injury or destruction.

[¶ 31.] A brief historical review of the relationship between the judiciary and the legislative branch when it delegates the power eminent domain discloses that by the middle of the Twentieth Century, the courts had almost totally yielded overview of takings and ceded to the legislative branch the power to define what was taking for a public purpose.

[¶ 32.] Although the determination of whether a use is public or not is said to be a judicial question, the courts have moved so far from the idea that actual use by an appreciable part of the public is a requisite to public purpose, toward a conclusion that if any public purpose is served public use is unnecessary, that it is almost correct to say that the question of whether a taking of land is for a public use is a legislative and not a judicial one *see United States ex rel. T.V.A. v. Welch,* 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843 (1946). Thus, use of the condemnation power has been upheld where the purpose was to clear slums, beautify and area, construct low-cost housing, provide off-street parking and promote industrialization. Encyclopedia Britannica, 1963, Volume 8, *Eminent Domain* p. 336.

[¶ 33.] In South Dakota we concurred with this historical trend. In 1950 we held the following:

The question of the existence of the necessity for exercising the right of eminent domain, where it is first shown that the use is public, is not open to judicial investigation and determination, but that

the body having power to exercise the right of eminent domain is also invested with power to determine the existence of the necessity.

*City of Bristol v. Horter,* 73 S.D. 398, 403, 43 N.W.2d 543 (1950) (quoting *Chicago, M. & St. P.R. Co. v. Mason,* 23 S.D. 564, 122 N.W. 601, 603 (1909)).

[¶ 34.] A review of the code shows dozens of grants of eminent domain power. Municipalities can clear entire city blocks on a finding that the area is a slum or blighted area, for example. SDCL 11–8–50. Even recycling and waste management districts, SDCL 34A–16–16 and television translator districts, SDCL 49–32A–17 have the power of eminent domain.

[¶ 35.] This is not the first case where a landowner challenged a taking under SDCL 21–35–10.1. The landowner in *Basin Elec. Power Co-op v. Payne, supra,* challenged the taking under the statute. The statute is relatively new in the eminent domain law only having been adopted in 1976 and amended in 1977. The pertinent parts of that statute read as follows:

> Within thirty days from the date the summons described in § 21–35–9 is served, the defendant may demand a hearing in circuit court on the petitioner's right to take.... The finding of necessity by the plaintiff, unless based upon fraud, bad faith or an abuse of discretion, shall be binding on all persons.

[¶ 36.] A reader of that statute might conclude that the legislature granted the courts new powers to review and perhaps, some might fear, micromanage condemnation proceedings. A review of the cases, however, teaches us that the legislature only codified the standards followed by the courts in eminent domain cases.

[¶ 37.] In *City of Bristol v. Horter, supra,* 73 S.D. at 403, 43 N.W.2d 543, we recognized the right of the courts to review a taking on the basis of fraud, bad faith or abuse of discretion when we stated:

> In this case the purpose was public and the necessity was determined by the legally authorized municipal authority. It is not contended that the city is appropriating more land than is necessary for the use intended, and there is no claim of fraud, bad faith or abuse of discretion. Therefore the city's determination that the necessity for the taking exists is conclusive.

[¶ 38.] We continued to recognize the residual power of the judiciary to examine takings noting that the entity delegated the condemnation power must strictly follow the requirements established by the legislature. *Illinois Cent. R.R. Co. v. East Sioux Falls Quarry Company,* 33 S.D. 63, 144 N.W. 724 (1913). Two quotations from that opinion show our thoughts in the use of and limitations on the eminent domain powers.

> Appellants declare, and we think correctly, that it devolves upon a party seeking, through delegated power, to exercise the right of eminent domain to show:
>
> (1) That such party is *within the class* to whom the power has been delegated.
>
> (2) That all *conditions precedent* have been complied with.
>
> (3) That the purpose for which the property is to be taken is one of the purposes *enumerated in the statute.*
>
> (4) That the property is to be taken for a *public use.*
>
> (5) That the particular property sought to be taken is *necessary* to the

accomplishment of the public purpose intended.

144 N.W. at 724 and 725, and

> Has respondent complied with the statutory conditions precedent to the exercise of the power of eminent domain in this case? The power of eminent domain being a power which is possessed by a railway corporation solely by being delegated to such corporation by the sovereign power of the state, its existence depends upon a strict compliance with each and every condition prescribed by such sovereign power. (citations omitted).

144 N.W. at 726.

[¶ 39.] As we can see from a cursory view of the cases, the statute really adds nothing to the power that the courts continued to reserve, although we might deduce that the legislature intended the judiciary to be more assertive in its review and less deferential to the condemning power.

[¶ 40.] The bench and bar really have nothing to fear from this opinion. The opinion does not change the relationship among the entities using eminent domain and the judiciary when we examine the cases and compare them to the statute. The facts in this case are extreme and even absent the statute, SDCL 21–35–10.1, the trial judge was proper in overturning the city's actions.